IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| **ELICE C. NOWAK,** | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) |
| vs. | ) Civil No. 14-cv-554-CJP[1] |
| | ) |
| **CAROLYN W. COLVIN,** | ) |
| **Acting Commissioner of Social** | ) |
| **Security,** | ) |
| | ) |
| **Defendant.** | ) |

### MEMORANDUM and ORDER

**PROUD, Magistrate Judge:**

In accordance with 42 U.S.C. § 405(g), *pro se* plaintiff Elice C. Nowak seeks judicial review of the final agency decision denying her application for Supplemental Security Income (SSI) benefits pursuant to 42 U.S.C. § 423.[2]

### Procedural History

Plaintiff applied for benefits in March, 2011, alleging disability beginning on December 15, 2009. (Tr. 14). After holding an evidentiary hearing, ALJ James E. Craig denied the application in a written decision dated April 3, 2013. (Tr. 16-25). The Appeals Council denied review and the decision of the ALJ became the final agency decision. (Tr. 1). Administrative remedies have been exhausted

---

[1] This matter was referred to the undersigned for final disposition upon consent of the parties, pursuant to 28 U.S.C. §636(c).  See, Doc. 11.

[2] Plaintiff was represented by counsel when this case was filed.  Counsel was granted leave to withdraw.  See, Doc. 19.

1

and a timely complaint was filed in this Court.

Plaintiff has not filed a brief or otherwise identified any specific error in the ALJ's decision.   Therefore, the Court will undertake a general review of the record.

## Applicable Legal Standards

To qualify for SSI, a claimant must be disabled within the meaning of the applicable statutes.[3]   For these purposes, "disabled" means the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."   42 U.S.C. §423(d)(1)(A).   For a DIB claim, a claimant must establish that she was disabled as of her date last insured.   *Stevenson v. Chater*, 105 F.3d 1151, 1154 (7th Cir. 1997).

A "physical or mental impairment" is an impairment resulting from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques.   42 U.S.C. §423(d)(3).   "Substantial gainful activity" is work activity that involves doing significant physical or mental activities, and that is done for pay or profit.   20 C.F.R. §§ 404.1572.

Social Security regulations set forth a sequential five-step inquiry to

---

[3] The statutes and regulations pertaining to Disability Insurance Benefits (DIB) are found at 42 U.S.C. § 423, et seq., and 20 C.F.R. pt. 404.   The statutes and regulations pertaining to SSI are found at 42 U.S.C. §§ 1382 and 1382c, et seq., and 20 C.F.R. pt. 416.   As is relevant to this case, the DIB and SSI statutes are identical.   Furthermore, 20 C.F.R. § 416.925 detailing medical considerations relevant to an SSI claim, relies on 20 C.F.R. Pt. 404, Subpt. P, the DIB regulations. Most citations herein are to the DIB regulations out of convenience.

2

determine whether a claimant is disabled. The Seventh Circuit Court of Appeals has explained this process as follows:

> The first step considers whether the applicant is engaging in substantial gainful activity. The second step evaluates whether an alleged physical or mental impairment is severe, medically determinable, and meets a durational requirement. The third step compares the impairment to a list of impairments that are considered conclusively disabling. If the impairment meets or equals one of the listed impairments, then the applicant is considered disabled; if the impairment does not meet or equal a listed impairment, then the evaluation continues. The fourth step assesses an applicant's residual functional capacity (RFC) and ability to engage in past relevant work. If an applicant can engage in past relevant work, he is not disabled. The fifth step assesses the applicant's RFC, as well as his age, education, and work experience to determine whether the applicant can engage in other work. If the applicant can engage in other work, he is not disabled.

*Weatherbee v. Astrue*, 649 F.3d 565, 568-569 (7th Cir. 2011).

Stated another way, it must be determined: (1) whether the claimant is presently unemployed; (2) whether the claimant has an impairment or combination of impairments that is serious; (3) whether the impairments meet or equal one of the listed impairments acknowledged to be conclusively disabling; (4) whether the claimant can perform past relevant work; and (5) whether the claimant is capable of performing any work within the economy, given his or her age, education and work experience.  20 C.F.R. §§ 404.1520; *Simila v. Astrue*, 573 F.3d 503, 512-513 (7th Cir. 2009).

If the answer at steps one and two is "yes," the claimant will automatically be found disabled if he or she suffers from a listed impairment, determined at step three.  If the claimant does not have a listed impairment at step three, and cannot

perform his or her past work (step four), the burden shifts to the Commissioner at step five to show that the claimant can perform some other job. *Rhoderick v. Heckler*, 737 F.2d 714, 715 (7th Cir. 1984). *See also Zurawski v. Halter*, 245 F.3d 881, 886 (7th Cir. 2001) (Under the five-step evaluation, an "affirmative answer leads either to the next step, or, on Steps 3 and 5, to a finding that the claimant is disabled…. If a claimant reaches step 5, the burden shifts to the ALJ to establish that the claimant is capable of performing work in the national economy.").

This Court reviews the Commissioner's decision to ensure that the decision is supported by substantial evidence and that no mistakes of law were made. It is important to recognize that the scope of review is limited. "The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive. . . ." 42 U.S.C. § 405(g). Thus, this Court must determine not whether Ms. Nowak was, in fact, disabled at the relevant time, but whether the ALJ's findings were supported by substantial evidence and whether any errors of law were made. See, *Books v. Chater*, 91 F.3d 972, 977-78 (7th Cir. 1996) (citing *Diaz v. Chater*, 55 F.3d 300, 306 (7th Cir. 1995)).

The Supreme Court has defined "substantial evidence" as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 91 S. Ct. 1420, 1427 (1971). In reviewing for "substantial evidence," the entire administrative record is taken into consideration, but this Court does <u>not</u> reweigh evidence, resolve conflicts, decide questions of credibility,

or substitute its own judgment for that of the ALJ. *Brewer v. Chater*, 103 F.3d 1384, 1390 (7th Cir. 1997). However, while judicial review is deferential, it is not abject; this Court does not act as a rubber stamp for the Commissioner. See, *Parker v. Astrue*, 597 F.3d 920, 921 (7th Cir. 2010), and cases cited therein.

## The Decision of the ALJ

ALJ Craig followed the five-step analytical framework described above. He found that plaintiff had not engaged in substantial gainful activity since the alleged onset date. He found that plaintiff had severe impairments of interstitial cystitis, history of Crohn's colitis, depression, generalized anxiety disorder, pain disorder associated with psychological factors and a medical condition, pseudoseizures, borderline personality traits, somatization disorder versus somatic delusions, and opiate dependence and abuse. He further determined that these impairments did not meet or equal a listed impairment.

The ALJ found that Ms. Nowak had the residual functional capacity (RFC) to perform light work with no exposure to dangerous electric shock, moving machinery or heights. She was unable to perform detailed or complex tasks, and was restricted to only occasional intermittent contact with coworkers, supervisors and the public.

Based on the testimony of a vocational expert, the ALJ found that plaintiff was able to do jobs which exist in significant numbers in the national and local economies. Therefore, he concluded that she was not disabled during the relevant time period.

5

**The Evidentiary Record**

The Court has reviewed and considered the entire evidentiary record in formulating this Memorandum and Order. The following is a summary of pertinent portions of the record.

1. **Agency Forms**

Plaintiff was born in 1962, and was 47 years old on the alleged onset date of December 15, 2009. (Tr. 117). She alleged that she was unable to work because of a seizure disorder, interstitial cystitis, and depression. (Tr. 121). She had worked in the past as a "team leader" at a Target store, a room inspector in a hotel, a dog handler at a kennel, a cashier and a receptionist. (Tr. 144-145).

In a Function Report filed in August, 2011, plaintiff stated that she had constant pain and had to be "heavily medicated to prevent seizures." She stated that she was "bedridden." (Tr. 180-181).

Plaintiff's adult children lived with her. Her son filed a report in August, 2011, in which he stated that plaintiff had "1 or less" seizures a month and he had witnessed his mother have a total of 4 seizures. (Tr. 202). Plaintiff's adult daughter filed a report stating that her mother had "1 or less" seizures a month, and she had witnessed only 1 seizure. (Tr. 203).

2. **Evidentiary Hearing**

Plaintiff was represented by an attorney at the hearing on February 27, 2013. (Tr. 40).

6

Plaintiff testified that her niece was taking care of her. Her niece took care of everything around the house and helped her with her personal care. She even had to cut up plaintiff's food. Plaintiff's right hand did not work very well since she had a very bad seizure in October, 2012. (Tr. 46-47).

She had a Medicaid card. (Tr. 41).

Ms. Nowak testified that she had 3 to 4 seizures a month during which she was "out" for 5 to 30 minutes. She was not functional for several hours after a seizure. Medication controlled her seizures for a while, but then she became tolerant of the medication. (Tr. 43).

Cystitis caused her to have "constant bleeding" from her bladder, and constant pain. It was "completely painful" and she was "bedridden most of the time." (Tr. 45).

A vocational expert also testified. The ALJ asked a hypothetical question that corresponded to the ultimate RFC findings, set forth above. The VE testified that this person could not do plaintiffs past work but she could do other jobs such as bench assembler, electrical assembler and bench hand. (Tr. 50-51).

3.     **Medical Treatment**

   (a)     **Seizure Disorder**

Ms. Nowak was admitted to the hospital for seizure activity in December, 2009. She had been diagnosed with a seizure disorder several years earlier and started on anti-seizure medication. She stopped taking the medication about a

7

year prior to the hospitalization. She was restarted on anti-seizure medication. (Tr. 265-271). She followed up with Dr. Syed Shah in February, 2011. She had not had any more seizures. She was taking Keppra and Dilantin. She was to continue on those medications and return in 4-6 weeks. (Tr. 223). There are no further office notes from Dr. Shah.

In June, 2011, plaintiff told a doctor that she had not been taking Dilantin and had not had any seizure activity. (Tr. 475).

Ms. Nowak saw Dr. Roger Joy in his office for problems related to cystitis on September 30, 2011. He had seen her in the hospital and had increased her dosage of Dilantin because her level was extremely low. She had "denied noncompliance as a reason why." She said she had a seizure the previous Friday. (Tr. 610-613). On December 27, 2011, plaintiff told Dr. Joy that she had not had any more seizures. (Tr. 703). The next mention of a seizure in Dr. Joy's records is dated January 11, 2012. Plaintiff said she had gone to the emergency room for a seizure a couple of days prior. (Tr. 618). There is no emergency room record of this visit.

Plaintiff told Dr. Julia Bancroft that she went the emergency room for a seizure in August, 2012. (Tr. 805). On October 11, 2012, she told Dr. Bancroft she had 8 seizures in 2 weeks. (Tr. 814). Dr. Bancroft's office notes indicate that plaintiff was exercising daily, for a total of 5 to 10 hours a week in the fall of 2012. (Tr. 806, 809, 812, 815).

On October 17, 2012, plaintiff was admitted to St. Elizabeth's Hospital in

Belleville, Illinois, on transfer from the emergency room at another hospital. She had gone to the emergency room for suicidal ideation. She claimed that she had a seizure in the ambulance. Dr. Randy Jung determined that this episode was really a pseudoseizure. She gave inconsistent accounts of her medications during her stay, so the pharmacy was called. She had not had any medications dispensed since November, 2011. Dr. Jung stated that she presented a "melodramatic presentation" and the ambulance was diverted to another hospital "where she was evaluated and had absolutely no physical signs whatsoever that indicated any type of physical signs of pathology." She was hospitalized for 5 days. Dr. Jung concluded that her reports of "terrible excruciating symptoms seems largely exaggerated." He observed that she did not appear to be in "any kind of meaningful physical distress whatsoever." In addition, she claimed to be depressed, but he observed no evidence to support that claim. She claimed to have had a prior stroke, but a CT scan of the brain was normal, which "called into question" her claim of a prior stroke. She claimed that she had not used opiates "for years," but a drug screen was positive for opiates. Dr. Jung stated that he "strongly suspect[s] this patient is trying to represent herself as having exaggerated symptomology in some effort to gain additional housing and food in a manner similar to the pseuodseizure she had in the ambulance…." (Tr. 819-825).

  **(b) Cystitis/Crohn's Disease**

Plaintiff was hospitalized a number of times for complaints relating to cystitis and/or Crohn's disease. See, 225-370, 453-563, 659-801, 818-836, 842-921).

9

In December, 2009, Dr. Solomon Apostol noted that she had been doing "relatively well at home with her sulfasalazine tablets" until two weeks prior to admission.  (Tr. 283-284).  In February, 2010, Dr. Apostol noted that she had been doing well up until two days prior to admission.   (Tr. 256-257).

Ms. Nowak was hospitalized again in June, 2011, under the care of Dr. Niranjan Shrestha.   The nurses who were taking care of her reported that she had "significant drug-seeking behavior."   Dr. Shrestha determined that he would no longer act as her primary care physician "due to her drug-seeking behavior."   (Tr. 480).

Plaintiff then came under the care of Dr. Roger Joy.   She was hospitalized under Dr. Joy's care in February, 2012.   In the discharge summary, Dr. Joy wrote:

> The patient is a frequent admission with this bladder pain that has been going on for many years.  There is no true treatment of this, other than to provide analgesics.  We do however believe that the patient's discomfort is not as bad as she says, and we have to be very careful about how we approach her in the hospitalization with IV narcotics.

(Tr. 760).

Plaintiff was again hospitalized at the end of March, 2012.   Dr. Joy's history and physical note states:

> This is a 49-year old female who was in the office complaining of her usual suprapubic pain, abdominal pain, nausea and vomiting stating that it had been ongoing for 4-5 days.  The patient has chronic interstitial cystitis by history, has had multiple admissions to the hospital for pain management and antiemetics despite the history elicited from her.  There was never any evidence of her being dehydrated.  We have never witnessed any nausea and vomiting in the hospital.  There is certainly some suspicion to her history. We have

10

> obtained some records from her previous provider which do document interstitial cystitis. However, it appears that this patient has been on ongoing narcotics since at least 2007.

(Tr. 739).

Plaintiff was hospitalized again in mid-April, 2012. In a progress note, Dr. Joy noted that plaintiff claimed to have vomited twice while in the hospital the previous day. He wrote, "However, it was unwitnessed and when the nursing staff saw it, it was cold and did not appear to be something that the patient regurgitated." (Tr. 845). In the discharge summary, Dr. Joy noted that plaintiff was admitted through the emergency room, and she initially had bacteria in her urine. She was started on antibiotics because of concern that she had a urinary tract infection. He continued:

> Because there was concern of her contamination, the urinalysis was repeated on a straight cath preparation. It is amazing that on her original specimen from the emergency department, there was 3+ blood. However on a repeat urinalysis by straight cath, there was no red blood cells. This is the second time that this has occurred in this individual who states constant pain and constant hematuria. She has given us a history of having bladder cancer and having some InterStim anticarcinogenic agents as the etiology of her interstitial cystitis. We have queried the Army facility that this is supposedly to have occurred and we are awaiting their records.

(Tr. 846). Dr. Joy also noted that her hospital course was "uncomplicated" and the "only thing she wanted was her pain medications on time." She asked Dr. Joy to let her stay another day, but he felt it was not justifiable. She was to see a urologist in Chicago for further evaluation. (Tr. 846).

    c)    **Depression/Anxiety**

11

As was detailed above, plaintiff was admitted to St. Elizabeth's Hospital on October 17, 2012, on transfer from the emergency room at another hospital. She had gone to the emergency room for suicidal ideation. In the discharge summary, Dr. Jung noted discrepancies in plaintiff's presentation. He doubted that she had a real seizure in the ambulance, she had not had her prescriptions filled since November, 2011, and her "self report of all these terrible excruciating symptoms seems largely exaggerated." He also noted that she claimed that her depression was worse, but she "actually seems totally without evidence as an external observer of being particularly depressed or anxious." (Tr. 819). In an addendum, he noted that she did not have a home to go to upon discharge, and he "strongly suspect[ed] this patient is trying to represent herself as having exaggerated symptomology in some effort to gain additional housing and food. . . ." (Tr. 821).

Plaintiff was admitted to St. Mary's Good Samaritan Hospital in Centralia, Illinois, in November, 2012, for suicidal ideation. She had been abusing Vicodin, taking 10 to 12 pills a day, and had been kicked out of her son's home. She had not been taking her seizure medication. Her drug screen was positive for opiates. She indicated that she wanted to "get detoxed." (Tr. 914). She was discharged after 4 days in improved condition. Her niece had agreed that plaintiff could stay with her. The Axis I diagnoses were substance-induced mood disorder, opiate dependence and opiate abuse. She had psychosocial stressors of homelessness and addiction to pain medication. It was "strongly suggested that she go through a substance abuse program." (Tr. 911-912).

**4.    Opinions of Treating Doctors**

There are no functional assessments from plaintiff's treating doctors in the record.

**5.    Consultative Psychological Exam**

Fred Klug, Ph.D., performed a consultative psychological exam in May, 2011. He concluded that Ms. Nowak's attention span was adequate and her concentration was good. Her immediate and long term memory were intact, but her short term memory was poor. New learning ability was good. Tests for central nervous system deficits were negative for brain impairment. Her thought processes were goal-directed and relevant, and she had no hallucinations, delusions, obsessions or compulsions. (Tr. 405-408).

## Analysis

Plaintiff has not identified any particular error committed by the ALJ. The Court has undertaken a general review of the record and of the ALJ's decision, recognizing that the Court must act as an impartial decision maker and not as an advocate for the *pro se* plaintiff. *Pliler v. Ford*, 124 S. Ct. 2441, 2446, 159 L. Ed. 2d 338 (2004).

After carefully reviewing the administrative record and the ALJ's decision, this Court concludes that the final decision of the Commissioner must be affirmed, for the following reasons.

ALJ Craig followed the established five-step sequential analysis. In

performing this analysis, he discussed the relevant medical evidence. This is not a case in which the ALJ cherry-picked the evidence or ignored evidence favorable to the plaintiff's case. See, e.g., *Srogham v. Colvin*, 765 F.3d 685, 698 (7th Cir. 2014).

The ALJ's credibility analysis was based on appropriate factors and was supported by references to specific evidence. "So long as an ALJ gives specific reasons supported by the record, we will not overturn his credibility determination unless it is patently wrong." *Curvin v. Colvin*, 778 F.3d 645, 651 (7th Cir. 2015). In particular, the ALJ noted that plaintiff's doctors were skeptical of her complaints, that the medical records and the reports of her adult children contradicted her account of her seizure disorder, and that there was no evidence in any of the medical records to support her claim that she was in constant pain and was bedridden.

The ALJ's RFC assessment was supported by the opinion of a state agency consultant. "State agency medical and psychological consultants are highly qualified physicians and psychologists who are experts in the evaluation of the medical issues in disability claims under the Act." SSR 96-6p, 1996 WL 374180, at *2. It is proper for the ALJ to rely upon the assessment of a state agency consultant. *Schmidt v. Barnhart*, 395 F.3d 737, 745 (7th Cir. 2005). Lastly, the ALJ's conclusion that plaintiff was able to perform jobs that exist in the national and local economies was supported by the testimony of a vocational expert.

In sum, after careful review of the record as a whole, the Court is convinced

that ALJ Craig committed no errors of law, and that his findings are supported by substantial evidence.  Therefore, the final decision of the Commissioner must be affirmed.

## Conclusion

The final decision of the Commissioner of Social Security denying Elice C. Nowak's application for disability benefits is **AFFIRMED**.

The Clerk of Court shall enter judgment in favor of defendant.

**IT IS SO ORDERED.**

DATE:   June 2, 2015.


s/ Clifford J. Proud
**CLIFFORD J. PROUD**
**UNITED STATES MAGISTRATE JUDGE**